**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br>vs.<br>Urbano Nario-Marquez,<br>　　　　Defendant. | CR 06-1498-TUC-FRZ (JCG)<br><br>REPORT AND RECOMMENDATION |

On July 31, 2007 Defendant Nario-Marquez filed a Motion to Suppress Unlawful Search. (Doc. No. 45.) On August 10, 2007, the government filed a Response. (Doc. No. 52.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral on September 25, 2006, pursuant to LRCrim 5.1.

This matter was set for evidentiary hearing and evidence was heard on September 11, 2007. Defendant Nario-Marquez, who remains in custody at this time, was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress.

**BACKGROUND AND FACTUAL FINDINGS**

On September 1, 2005, Nario-Marquez was stopped by uniformed police officers. A subsequent search of the car found contraband which Defendant now seeks to suppress. The constitutionally of the stop was previously challenged and upheld. (Order dated August 8,

1  2007, Doc. No. 51.)  The issue presented in the pending motion to suppress is whether the
2  officers' search of the Defendant's vehicle was constitutional, and specifically, whether the
3  search occurred prior to or subsequent to his arrest.  The testimony regarding this issue was
4  in conflict and disputed.

5  **Testimony of the Police Officers**

6  Tucson Police Department Sergeant Berson, along with Tucson Police Department
7  Officers Carrizosa and Gonzales, testified on behalf of the government as follows.

8  On September 1, 2005, Sergeant Berson, a Tucson Police Officer assigned to the
9  fugitive task force, requested the assistance of uniformed officers in performing a stop of
10 Nario-Marquez and his vehicle.  (Transcript 9/11/07, pg. 6, lines 5-14.)[1]  Sergeant Berson
11 requested assistance after observing Defendant's vehicle weaving both in its lane and over
12 the lane divider.  (*Id.*)  At the time that Sergeant Berson requested the traffic stop, he
13 believed that the Defendant was a fugitive wanted on an outstanding homicide warrant. (pg.
14 4, line 15 - pg. 5, line 6; pg. 46, lines 11-22.)

15 When Nario-Marquez turned his vehicle off of Campbell Avenue onto Calle
16 Grandiosa, a residential street,  Officer Carrizosa, one of the uniformed officers who had
17 responded to the scene, pulled behind Defendant in his fully-marked patrol car and turned
18 on his siren and overhead lights.  (pg. 29, line 1 - pg. 30, line 6.)  The Defendant failed
19 immediately to stop.  (pg. 30, lines 1-13.)  He continued to drive his vehicle towards a
20 residence on Calle Grandiosa. (*Id.*)  When the garage door to the residence began opening,
21 Officer Carrizosa drove his vehicle forward, positioning it to block  Nario-Marquez from
22 entering the driveway to the residence.  (pg. 30, lines 9-14.)  Officer Carrizosa ordered
23 Nario-Marquez to turn off his vehicle and place his hands up. (pg. 31, lines 15-16.)  Nario-
24 Marquez did not immediately comply.  (pg. 31, lines 18-19.)  Before raising his hands, he
25 moved a small gray bag from his lap down to either the console or the floorboard to his right.
26 (pg. 31, lines 14-23.)  With guns drawn and the car surrounded, Officer Gonzales, another
27 uniformed officer who had responded to the scene, approached Nario-Marquez and removed
28

---

[1] Citations to the 9/11/07 transcript are hereinafter referred to as "(pg. __, lines __.)"

1 him from the vehicle. (pg. 32, lines 13-19; pg. 37, lines 21-23; pg. 47, line 15 - pg. 48, line
2 17.)

3 Once Nario-Marquez was removed from the vehicle, Officer Gonzales led him away
4 from his car toward a patrol car, frisked him and handcuffed him. (pg. 52, line 21 - pg. 53,
5 line 17; pg. 53, line 23 - pg. 54, line 2.) Officer Gonzalez did not search Defendant or his
6 vehicle. (pg. 49, lines 15-18.) Officer Gonzalez did not remove Defendant's wallet, as he
7 was only frisking him for weapons. (pg. 56, lines 2-8.) While Nario-Marquez was standing
8 outside the patrol car, Sergeant Berson asked him for identification. (pg. 15, line 25 - pg. 19,
9 line 2; pg. 56, lines 13-18.) Nario-Marquez stated that he did not have any identification
10 with him, and provided Sergeant Berson with several different names in response to
11 questions about his identity. (pg. 10, lines 1-5; pg. 55, lines 10-16.) The officers, using the
12 mobile data computers in their vehicles, confirmed that the names provided by Defendant
13 were false. (pg. 10, lines 1-8; pg. 19, line 3 - pg. 21, line 18.) Nario-Marquez was arrested
14 for providing false information to law enforcement officers. (pg. 10, line 18 - pg. 11, line 7.)
15 Sergeant Berson testified that there was no other basis for his arrest at that time. (pg. 22, line
16 19 - pg. 23, line 3.)

17 After placing Nario-Marquez under arrest, the officers conducted a search of
18 Defendant's person; that search revealed two Arizona ID cards with two different names –
19 neither of which had been verbally provided to the officers by Nario-Marquez – in
20 Defendant's wallet. (pg. 11, line 22 - pg. 12, line 9.) Defendant was then moved into a
21 patrol car where Sergeant Berson began recording his questioning of Defendant. (pg. 10, line
22 21 - pg. 11, line 14; pg. 23, lines 12-20; pg. 50, lines 2-7; pg. 54, lines 18-23.)

23 After the decision to arrest the Defendant was made, Berson's supervisor, Sergeant
24 Leonardi, advised Officer Carrizosa that Nario-Marquez was under arrest and asked Officer
25 Carrizosa to conduct a search of the vehicle. (pg. 34, lines 4-15; pg. 41, lines 1-24; pg. 43,
26 lines 10-12.) During the search of Defendant's vehicle, Officer Carrizosa discovered a
27 shaving kit bag on the driver's side floor, which matched the bag that Officer Carrizosa had
28 observed Nario-Marquez handling during the traffic stop. (pg. 34, line 20 - pg. 35, line 7.)

1 According to the parties' motion and opposition, Officer Carrizosa discovered a loaded
2 revolver handgun, several small bags of crack cocaine and several pills inside the bag.

3 Later, Nario-Marquez was transported by Officer Gonzales to the Pima County jail.
4 (pg. 70, lines 1-4.) Officer Gonzales testified that during the drive to the jail, Nario-Marquez
5 spontaneously stated "Hey dude, sorry for all those names, but you know how it goes." (pg.
6 70, line 1- pg. 71, line 23.) Nario-Marquez was subsequently charged with possession of a
7 firearm by a convicted felon, possession of a firearm by an illegal alien, possession with
8 intent to distribute cocaine base, possession with intent to distribute cocaine, and possession
9 of a firearm in relation to a drug offense.

**Testimony of Defendant Nario-Marquez**

Nario-Marquez testified on his own behalf.  His testimony, which contradicted the officers' testimony in material respects, was internally inconsistent and, therefore, unreliable.

According to Nario-Marquez, the search of his vehicle occurred before he was arrested. (pg. 63, lines 20-22.)  However, his testimony was inconsistent as to the circumstances of the arrest. Nario-Marquez first testified that when the officers removed him from his car, they handcuffed him and placed him *behind* a marked vehicle. (pg. 60, lines 10-23.)  He later testified that, after being handcuffed, he was immediately placed *inside* the patrol car. (pg. 62, lines 7-20.) Nario-Marquez stated that, from inside the back of the patrol car,  he observed Officer Carrizosa search his vehicle and remove the gray bag from the vehicle. (pg. 62, line 18 - pg. 63, line 19.) He testified that he believes he was arrested after the bag was searched, because Sergeant Berson told him that he was under arrest for possession of narcotics and a weapon. (pg. 68, lines 1-21.)

On direct examination, Nario-Marquez testified that when the officers asked for his name, he responded with his true name of Urbano Nario and that he did not recall providing the officers with any names other than his true name. (pg. 61, lines 7-17.)  On cross-examination Nario-Marquez testified that the officers never asked him his name or for an ID. (pg. 66, lines 4-10.)  He testified that he never gave officers any false names or true names. (pg. 66, lines 20-22.) Nario-Marquez also testified, contrary to the police officers' testimony,

- 4 -

1  that the officers removed his wallet immediately after handcuffing him. (pg. 60, lines 10-16.)

2  Nario-Marquez testified that once he was in the patrol car, Sergeant Berson showed him two photographs and asked him which of the photos was him. (pg. 64, lines 2-17.) Nario-Marquez told Sergeant Berson that neither was him. (*Id.*) Nario-Marquez claims that none of the officers spoke to him again until they were preparing to leave the scene, at which time Sergeant Berson asked Nario-Marquez what was in the gray bag. (pg. 64, line 18 - pg. 65, line 4.) Nario-Marquez recalls that Sergeant Berson was recording his interview with Nario-Marquez while questioning him about the gray bag and testified that Sergeant Berson subsequently informed him that he was being placed under arrest for possession of narcotics and a weapon. (pg. 65, lines 5-20.) Nario-Marquez testified that Officer Carrizosa had searched his car before Sergeant Berson placed him under arrest. (*Id.*)

Nario-Marquez denied making the statement, "hey dude, sorry for all those names, but you know how it goes" to Officer Gonzales while *en route* to the jail. (pg. 67, lines 8-12.)

**ANALYSIS**

Nario-Marquez argues that officers unlawfully searched his vehicle, and therefore all evidence resulting from the search must be suppressed.

The Fourth Amendment's prohibition against unreasonable searches and seizures has been interpreted as permitting officers, when making a lawful custodial arrest, to make a contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. *See Chimel v. California*, 395 U.S. 752, 763 (1969). Such searches have long been considered valid because of the need "to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape" and the need to prevent the concealment or destruction of evidence. *Id.* When a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. *See New York v. Belton*, 453 U.S. 454, 460 (1981). The police may also examine the contents of any containers found within the passenger compartment, whether those containers are open or closed. *Id.* at 460-61. Nario-Marquez concedes that the Constitution permits searches of vehicles incident to arrest

1  (73/15-19), but argues that the search in this instance occurred prior to the Nario-Marquez's
2  arrest.

3  The government provided credible testimony that Nario-Marquez was arrested for
4  providing false information to law enforcement officers prior to any search of his vehicle.
5  Sergeant Berson credibly testified that he placed Nario-Marquez under arrest once he was
6  discovered that the names being provided by Nario-Marquez at the outset of his detention
7  were false.  He then directed that Nario-Marquez be placed in a patrol car and advised his
8  supervisor, Sergeant Leonardi, who then authorized the search of Nario-Marquez's vehicle.
9  All three officers testified that none of the officers had any contact with the vehicle once
10 Nario-Marquez was removed until Sergeant Leonardi advised Officer Carrizosa that Nario-
11 Marquez was under arrest and asked Officer Carrizosa to search the vehicle. Officer
12 Carrizosa provided credible testimony that he was specifically monitoring Defendant's
13 vehicle from the time Nario-Marquez was removed from the vehicle until he was asked to
14 conduct a search of the vehicle after Nario-Marquez's arrest, and that no officers entered the
15 vehicle. Accordingly, the search of Defendant's vehicle was a lawful search incident to an
16 arrest.  Under *Belton*, the officers were authorized to open and search the shaving kit bag
17 discovered in Nario-Marquez's vehicle, as police may examine any closed containers
18 discovered in the passenger compartment of the vehicle during a search conducted incident
19 to an arrest.

20 Nario-Marquez contends that the search of his vehicle commenced after he was
21 handcuffed and taken away from his car, and before he was arrested.  However, the
22 testimony offered by Nario-Marquez in support of his argument was inconsistent and not
23 credible.  Nario-Marquez testified on direct that the officers asked him his name but that he
24 did not recall providing the officers with any names other than his true name of Urbano
25 Nario. On cross-examination Nario-Marquez testified that the officers never asked him his
26 name. Nario-Marquez's testimony on this point was not only inconsistent, but also directly
27 contradictory to Sergeant Berson's testimony that is standard procedure for an officer to ask
28 for a name and identification when making a traffic stop and directly contradictory to both

1  Sergeant Berson and Officer Gonzales' testimony that Nario-Marquez gave numerous names
2  when asked to identify himself. Nario-Marquez's testimony was also impeached by evidence
3  from the government that on the ride to the police station, Nario-Marquez apologized to
4  Officer Gonzales for "all those names."[2]

5  In addition, although Nario-Marquez claimed that he was not arrested until after the
6  officers opened the gray bag and Sergeant Berson questioned him about it, Nario-Marquez
7  recalled that when Sergeant Berson questioned him about the gray bag, the conversation was
8  being tape-recorded. Sergeant Berson testified that he did not begin to tape record his
9  conversation with Nario-Marquez until after Nario-Marquez was placed under arrest.
10  Because Nario-Marquez's testimony is not credible or reliable, it does not refute the clear and
11  corroborated testimony presented by the government. Accordingly, the Magistrate Judge
12  concludes that the Defendant's Motion to Suppress Unlawful Search should be denied.

### RECOMMENDATION

14  In view of the foregoing, it is recommended that, after its independent review of the
15  record, the District Court DENY Defendant Nario-Marquez's Motion to Suppress Unlawful
16  Search. (Doc. No. 45). The parties have ten (10) days to serve and file written objections to
17  the Report and Recommendation. The parties are advised that any objections should be filed
18  with the following caption: **CR-06-1498-TUC-FRZ.**

19  DATED this 4th day of October, 2007.

_____
Jennifer C. Guerin
United States Magistrate Judge

---

[2] It is also difficult to credit Nario-Urbano's testimony that officers did not ask him to identify himself in light of the uncontested fact that the officers were stopping the Defendant with the underlying purpose of identifying whether he was a fugitive wanted on a homicide warrant. Similarly, it is not credible that the officers would ask the Defendant to select which photograph was him, but fail to ever ask the Defendant to identify himself.

- 7 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28